In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-11-00206-CR
_____

SELDON WAYNE COLVIN, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 359th District Court
Montgomery County, Texas
Trial Cause No. 10-05-05646-CR

MEMORANDUM OPINION

In 2011, Seldon Wayne Colvin was convicted of committing a capital murder and a murder in 1984. He received a life sentence for the capital murder and a forty year sentence for the murder. Colvin raises seventeen issues. We affirm the judgments and sentences.

SUFFICIENCY OF THE EVIDENCE

Colvin challenges the sufficiency of the evidence in his first two issues. The first count of the indictment alleged that Colvin intentionally caused the death of

John Buckels by shooting him with a firearm, while Colvin was in the course of kidnapping Buckels. The indictment's second count alleged Colvin intentionally or knowingly caused the death of Janis McMahan by shooting her with a firearm. The charges included instructions to the jury on the law of parties. *See* Tex. Penal Code Ann. §§ 7.01-.02 (West 2011).

*The Standard of Review*

We review a challenge to the legal sufficiency of the evidence in the light most favorable to the verdict to determine if a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *see also Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex. Crim. App. 2010). In reviewing the evidence, we give deference to the jury's responsibility to resolve any conflicts in the testimony, to weigh the evidence, and to draw reasonable inference from facts. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

The State relied in part upon the testimony of an accomplice, Thomas Conner. *See* Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005). In reviewing the sufficiency of corroboration evidence under the accomplice-witness rule, we "eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to

2

connect the accused with the commission of the crime." *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). "[T]he corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself." *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). "Rather, the evidence must simply link the accused in some way to the commission of the crime and show that 'rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense.'" *Id.* (quoting *Hernandez v. State*, 939 S.W.2d 173, 179 (Tex. Crim. App. 1997)). Moreover, "'[p]roof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction.'" *Id.* (quoting *Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984)).

The State also relied in part on the testimony of a "jailhouse informant." *See* Tex. Code Crim. Proc. Ann. art. 38.075 (West Supp. 2012). The same corroboration standard that applies to accomplice witnesses applies to jailhouse informants. *Schnidt v. State*, 357 S.W.3d 845, 851 (Tex. App.—Eastland 2012, pet. ref'd).

3

*The Evidence*

McMahan's mother last saw her daughter Janis on September 3, 1984. Janis left with a man her mother did not see. McMahan's mother recalled that they left in a dark truck that was probably green and had a camper on the back. McMahan's friend, Mark Allred testified that he and McMahan were both abusing methamphetamine in September 1984. He could not recall the date, but he last saw McMahan at a house on Newens Street with Buckels, a woman, and three other men. These men made Allred feel so uncomfortable that he asked McMahan to step outside and advised her to leave. One of the men was Conner. Afterwards, Allred wondered where McMahan was for about two weeks before he learned she had died.

Dan Norris, who at the time worked as a reserve officer for the Montgomery County Sheriff's department, recovered McMahan's and Buckels's bodies fifteen miles east of Conroe in Montgomery County on old Highway 105, which in September 1984 was a dirt road through a heavily wooded area. The bodies' advanced decomposition indicated they had been there for some time. Both Buckels and McMahan died from gunshot wounds. According to firearms examiner Charles Anderson, each of the bullets had been fired from a .38 or a .357. Two were jacketed hollow points and one was lead. In Anderson's opinion, at

4

least two different weapons were used to fire the three bullets. None of the four different weapons Anderson tested matched the bullets.

On September 28, 1984, detectives searched McMahan's former home on Carousel in Houston, Texas. Some glass panes had been removed from windows and placed in the grass in the backyard. Blood recovered inside the house was eventually determined to be McMahan's.

Conner described the circumstances under which Buckels was last seen alive. Conner's participation in Buckels's kidnapping made him an accomplice witness; to corroborate his testimony the State offered evidence of police surveillance of a green stepside pickup, and an encounter and subsequent arrest of Colvin, Conner, and Bobby Dobbs[1] on September 5, 1984. Acting on a tip from a confidential informant received two days earlier, Sergeant William T. Callaway conducted surveillance at the Crossroads Inn on Drummett Street in Houston. Callaway was looking for three armed men with a green stepside pickup truck. He knew Colvin's and Dobbs's names and their room number, 237, and Callaway had information that the men were going to leave as soon as possible. At 8:45 a.m., Conner walked out of a hotel room, approached the truck, and was taken into custody. The officers moved upstairs to the door of room 237. The persons inside

---

[1] Dobbs is deceased.

opened the door, noticed the officers, and moved back into the room. One of the men moved towards a rifle on the bed. Colvin ran to the back of the room, held his hands up, and said "I give up."

Colvin was arrested for possession of a firearm by a felon. Callaway also recovered a gold badge, a red light "like police use," jewelry, a .22 pistol, ammunition, and handcuffs. When he searched the green pickup, Callaway found "quite a bit" of blood, some of which was fresh and wet. Another officer collected a sample of the blood, which through DNA testing was subsequently determined to be McMahan's. Callaway impounded the truck to the crime lab and had it checked for fingerprints. Colvin's fingerprint was located on the passenger vent window. The truck was registered to Beth Renee Hearn. In an interview with police, Hearn stated that she knew Dobbs and her husband probably loaned the truck to Dobbs.

Conner stated that he had known Colvin for only a few weeks when they were arrested together at the Crossroads Inn on September 5, 1984. They had been using methamphetamine and heroin. Colvin and Dobbs shared a hotel room at the Crossroads Inn. On September 4, 1984, Conner went over to their hotel room late in the afternoon. They had Buckels with them, handcuffed. They asked Conner to watch Buckels to make sure he did not leave. They did not say why. Conner watched Buckels for a few hours. Colvin and Dobbs returned to the hotel room and

6

took Buckels away on the floorboard of a forest green GMC stepside pickup truck with an open bed.

Later that evening, Conner met Dobbs and Colvin again at the Crossroads Inn. Colvin appeared to be jittery from methamphetamine use. Colvin asked Conner if he would trade a pistol for some heroin, and Conner agreed. Colvin wiped down the gun, removed two or three cartridges, and handed it to Conner, then warned Conner not to "get busted" with the pistol because "two people had been hurt with this gun." It was a .38 Charter Arms. Conner traded the gun for some heroin, which he gave to Colvin. It was close to midnight when Conner returned to the hotel. The next morning, Dobbs told Colvin that Conner knew too much, but Colvin told Dobbs not to worry about him. Conner looked out the window and noticed the truck had a flat tire. He got the keys and went out to change the tire, then noticed the truck had two flat tires. As soon as Conner opened the truck, many police officers appeared. One of the officers asked him what the substance in the back of the truck was. Conner stated that an officer pushed his face in the substance and some got on his face. Conner confirmed that it was the same truck in which Dobbs and Colvin left with Buckels the previous day.

Conner, Dobbs and Colvin spent the next three days in the Houston City Jail. They were released without being questioned by anyone, although Conner had a parole violation and should have been returned to prison. Conner was arrested again a few weeks later. He had a .38 Charter Arms firearm in his possession at that time, but it was not the same gun that was given to him on September 4, 1984. Montgomery County sheriff's officers questioned him about the murders; he told them some of the same story he told at trial, but he did not tell them about watching Buckels or selling the gun.

On cross-examination, Conner stated that Larry Pate and Betty Matthews were with him at about 1:00 p.m. when he first went to Dobbs's and Colvin's hotel room, where they found Buckels handcuffed. After they all injected methamphetamine that Colvin had in his possession, Pate and Matthews returned to their own room.

Testifying for the defense, Pate denied knowing Dobbs in 1984, denied being in a hotel room with Dobbs and Colvin, and denied seeing a person in handcuffs at the Crossroads Inn. After being reminded that in 2010 he told detectives that he could not honestly say it did not happen, but that he did not remember seeing it happen, Pate stated that "I can honestly say I don't know if that didn't happen. I know it didn't happen in my room."

8

Conner also stated that while he was incarcerated in Texas in 1985 or 1986, Colvin wrote to a cellmate of Conner's, Darrell Jacob, asking Jacob to give Colvin an alibi for the murders. Testifying for the defense, Jacob admitted he knew Conner in the 1980's, used methamphetamine with him, and was housed in the same prison dorm as Conner. He also admitted that he knew both Dobbs and Colvin. Jacob denied that Colvin wrote to him in prison, and he stated when detectives interviewed him he told them "the same thing I just told you." On cross-examination, Jacob admitted that when they were imprisoned together in the 1980's, Conner had told him that when the police arrested him they put his face in some blood in the pickup truck, but he denied recalling that Conner told him Dobbs and Colvin were also with him. He also denied having told the detectives in 2010 that while they were in prison Conner had related the story about Buckels being handcuffed. The June 29, 2010, interview was recorded and was played to the jury. In the recording, it was revealed that Jacob had told the detectives Conner's story about Buckels being in handcuffs.

Bobby Dobson testified that he was living in the northern part of Houston and using methamphetamine in the 1980's. Dobson stated that he was arrested on a parole violation blue warrant on August 28, 1984. Dobson claimed he was incarcerated with Colvin in the Harris County Jail and that while they were in jail,

9

Colvin expressed concern about some blood in a truck. Dobson claimed Colvin told him that Colvin and Dobbs had committed a robbery and went to buy phenobarbital but shot the seller because he increased the price. He claimed Colvin told him that something happened at the "Crosswinds Motel," that they dumped the body north of Highway 105, and that a woman had also been killed. Dobson was arrested again at a K-Mart in Houston on May 10, 1985. Dobson stated that he had a relative contact the Montgomery County Sheriff's Department, and they transferred him to that county, where he gave a statement on May 16, 1985. In that statement, Dobson claimed Colvin admitted that he and Dobbs killed a man and a woman, then dumped the bodies north of Highway 105, and Colvin was concerned that the police had found blood in the truck that they used to carry the dead bodies.

*Argument and Analysis*

Colvin contends the evidence is insufficient to establish his participation in the offense because the State failed to pinpoint when his fingerprint came to be on the truck, failed to recover his DNA from the truck or the crime scene, failed to tie a weapon used in the murder to him, and failed to connect the murders of McMahan and Buckels.

Before we may consider the accomplice witness and jailhouse informant testimony in our evidentiary review, we must determine whether the other

10

evidence tends to connect Colvin to the murders of Buckels and McMahan. *See Solomon*, 49 S.W.3d at 361. The accomplice witness and jailhouse informant testimony is corroborated by the evidence that Colvin, Dobbs, and Conner were together in a room at the Crossroads Inn on September 5, 1984, and they had handcuffs and firearms in their possession. On September 5, Colvin was physically present in a hotel room with the person who borrowed the green truck from its owner and another person who was apprehended when he approached the truck. The police connected Colvin to the truck by identifying Colvin's fingerprint on the passenger vent window. McMahan's fresh blood was discovered in the truck's bed on September 5, two days after her mother last saw her alive and unharmed, and about the same time that Allred said he saw her alive and unharmed, in the company of Buckels and Conner. The bodies of McMahan and Buckels were dumped together in the same location at some time after September 3, and their corpses had achieved an advanced state of decomposition by September 28. Colvin's proximity to the green truck shortly after McMahan and Buckels disappeared, under suspicious circumstances in which Colvin, a convicted felon, was in possession of a firearm and equipment that indicated that Colvin, Dobbs, and Conner were engaging in criminal activity, tends to connect Colvin to the murders of McMahan and Buckels. *Malone*, 253 S.W.3d at 257. The corroborating

11

evidence provided a link between Colvin and the murders that is sufficient for the jury to consider all of the State's evidence in reaching its verdict. *See id.*

The jury could rationally have concluded that McMahan and Buckels died on September 4, 1984. McMahan's mother saw her alive on September 3, her fresh blood was on the green truck on September 5, and her decomposing body was recovered on September 28. Conner placed Buckels alive at the Crossroads Inn on September 4. Conner testified that Colvin and Dobbs left with a handcuffed Buckels in the same truck that on the following day contained McMahan's fresh blood. Buckels's decomposing body was recovered in the same location as McMahan's, and they both died from gunshot wounds from more than one gun. The facts support inferences that McMahan and Buckels were killed by the same person or by persons acting in concert. That inference is strengthened by Conner's testimony that on September 4 Colvin gave him a .38 Charter Arms pistol that Colvin claimed had been used to hurt two people.

Colvin contends the kidnapping is negated by the lack of DNA or fingerprint evidence connecting Buckels to the green truck. The State relied on Conner's testimony to prove that Colvin killed Buckels in the course of kidnapping him. According to Conner, while Buckels was handcuffed in the hotel room where Colvin was staying, Colvin and Dobbs asked Conner to make sure Buckels did not

12

leave. Conner stated that Buckles asked Conner to let him go, but Conner said that he could not do that. When Buckels did leave the hotel room, Colvin took him away, handcuffed, on the floorboard of the green truck. When Colvin returned, he stated that two people had been hurt with the .38 he had in his possession. Colvin secreted Buckels in the hotel room, where he was not likely to be found, then transported Buckels against his will to a location where Buckels was found shot to death.

The jury could rationally have found that Colvin and Dobbs left with Buckels so that they could kill him, and that McMahan's blood got on the truck and her body was dumped with Buckels' because they killed her too. The jury could rationally have found that Colvin participated in the commission of the murders of Buckels and McMahan as well as the kidnapping of Buckels, and that the murder occurred in the course of the commission of the kidnapping. Viewing all of the evidence in the light most favorable to the verdict, a rational trier of fact could have found the essential elements of the offenses beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. We overrule issues one and two.

## WARRANTLES SEARCHES

In three issues, Colvin challenges the trial court's denial of his motion to suppress the fruits of the September 5, 1984 warrantless search of the green truck

13

and the hotel room. He argues that the officers lacked legal authority to enter the room or to seize items from the either the room or the vehicle and that the evidence obtained through the unreasonable search and seizures should have been excluded from evidence.

*Standard of Review*

An appellate court should afford almost total deference to a trial court's determination of the historical facts that the record supports, especially when the findings are based on an evaluation of credibility and demeanor. *State v. Elias*, 339 S.W.3d 667, 673 (Tex. Crim. App. 2011) (quoting *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000)). We afford the same amount of deference to trial courts' rulings on the application of law to fact questions if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Id.* Otherwise, we review de novo mixed questions of law and fact. *Id.*

We must view the evidence in the light most favorable to the trial court's ruling. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007). When the record is silent on the reasons for the trial court's ruling, and no explicit findings were requested or made, we infer the necessary findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial

14

court's ruling, supports those findings. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008).

A balance between the public interest and the individual's right to personal security free from arbitrary interference determines the reasonableness of a particular search. *Brown v. Texas*, 443 U.S. 47, 50, 99 S. Ct. 2637, 2640, 61 L. Ed. 2d 357(1979). We consider: (1) the gravity of the public interest, (2) the degree to which the seizure advances the public interest, and (3) the severity of the interference with individual liberty. *Id.* at 51. A probable cause determination must be made in light of the totality of the circumstances. *Wiede*, 214 S.W.3d at 25. Probable cause for a search exists where the known facts and circumstances are sufficient to warrant a person of reasonable prudence in the belief that evidence of a crime will be found. *Id.* at 24.

*Facts and Circumstances*

Sergeant Callaway described the events leading to the arrest of Dobbs, Colvin, and Conner, the seizure of the green truck and the blood in the bed of the truck, and the seizure of the weapons and criminal instruments in the hotel room. An informant provided information that a white male, approximately 28 years old, between 5'3" to 5'4" tall, known as Buster or Duffy Colvin, had committed a robbery at a car lot at the intersection of Aldine Westfield and Warwick two weeks

earlier. According to the informant, Colvin and two other white males who participated in that offense as well as another robbery had been impersonating police officers. The informant said these persons were staying at the Crossroads Inn in room 237, and they were "'on crystal and heroin and very unpredictable.'" The informant told the officers the suspects had a gold badge, a red light, and they were ex-cons who carried guns. Callaway confirmed with Lieutenant Baines that there had been two or three robberies where white males identified themselves as police officers.

The informant told Callaway that Colvin, Dobbs and Conner were "involved in a high rate of robberies and homicides." Callaway's report noted that he had utilized the informant for criminal investigations in the past, and the informant had previously provided reliable information. Callaway would normally check for criminal history as a standard operating procedure, but he could not recall whether he confirmed the suspects' criminal histories in this particular case. Callaway obtained matching descriptions and composite drawings of the suspects from the robberies. From the composite drawing, they were able to confirm with the hotel manager that Colvin had on occasion stayed at the hotel. The manager confirmed that the suspects were in room 237. Callaway returned to the informant, who told Callaway that "the suspects had again committed another robbery and possible

homicide" and that the suspects were highly paranoid, using drugs, and were "contemplating leaving town immediately." Another officer confirmed the information about the robberies and murders.

The police set up surveillance at the hotel reported to them by the informant. They verified the room with the front desk clerk. Conner left the hotel room and walked to the truck, where he was detained. The officers then moved up the stairs to the hotel room and knocked on the door. Either Dobbs or Colvin opened the door, noticed the officers, and jumped back into the room, where one of the suspects reached for a rifle on the bed. Determined to reach the rifle first, Callaway entered the hotel room and secured the rifle. Officers secured the scene, and found a police light, guns, jewelry, handcuffs, and a gold badge in plain sight within the room. They arrested the three suspects.

When Conner was detained at the green truck, Callaway noticed both dried blood and wet blood near the tailgate in the bed of the truck. The blood was in plain view and there was no need to get into the truck to see it. Callaway directed Officer Heard to collect a sample of the blood before having the truck towed for processing as a crime scene. Officer James Heard testified that he arrived after the suspects had been detained. He absorbed the blood onto a clean white napkin, put it in a Ziplock-type bag, and placed it in a brown envelope. Callaway obtained a

"'hold authorization'" to place the suspects in the city jail while the robbery detectives performed a follow-up investigation.

*The Plain View Doctrine*

For a seizure of an object to be lawful under the plain view exception (1) the officers must lawfully be where the object can be plainly viewed, (2) the incriminating character of the object in plain view must be immediately apparent to the officers, and (3) the officers must have the right to access the object. *Keehn v. State*, 279 S.W.3d 330, 334 (Tex. Crim. App. 2009). In this case, officers observed the blood in the open bed of a pickup truck parked in a location accessible to the general public. *See State v. Weaver*, 349 S.W.3d 521, 527 (Tex. Crim. App. 2011) ("Police, although motivated by an investigative purpose, are as free as the general public to enter premises 'open to the public,' when they are open to the public.") (citing *Maryland v. Macon*, 472 U.S. 463, 470, 105 S. Ct. 2778, 86 L. Ed. 2d 370 (1985)). Additionally, Callaway's testimony supports a finding that the items recovered from the hotel room were in plain view once the officers entered the room.

*Exigent Circumstances*

Arguing that observing someone walk to a parked vehicle does not objectively give rise to any exigency that justified a warrantless entry into the hotel

room, Colvin argues the exigent circumstances rule does not justify the warrantless entry into the hotel room. Although searches and seizures inside a home are presumptively unreasonable, the warrant requirement is subject to certain reasonable exceptions. *Kentucky v. King*, ___ U.S. ___, 131 S. Ct. 1849, 1856, 179 L. Ed. 2d 865 (2011). The recognized exigent circumstances include "protecting police officers from persons whom they reasonably believe to be present, armed, and dangerous[,]" and "preventing the destruction of evidence[.]" *Gutierrez v. State*, 221 S.W.3d 680, 685 (Tex. Crim. App. 2007). Neither subjective bad faith on the part of the police nor reasonable foreseeability that the actions or tactics of the police would create exigent circumstances are considered in determining whether the exigent circumstances rule applies. *King*, 131 S. Ct. at 1859. Also, the exigent circumstances rule may apply notwithstanding the prior acquisition of evidence sufficient to establish probable cause and the availability of time to secure a warrant. *Id.* at 1860. "We have said that '[l]aw enforcement officers are under no constitutional duty to call a halt to criminal investigation the moment they have the minimum evidence to establish probable cause.'" *Id*. at 1860-61 (quoting *Hoffa v. United States*, 385 U.S. 293, 310, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966)). "[T]he exigent circumstances rule applies when the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment."

*Id.* at 1862. Where "the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry will be lawful if it is justified under the exigent circumstances rule. *See id.* at 1858.

Colvin suggests the police were not legally justified in approaching the hotel room without having first obtained a warrant. As *King* makes clear, however, an exigency created by constitutionally permissible police conduct does not affect the applicability of the exigent circumstances rule. *Id.* at 1859. Here, the informant provided information justifying further investigation. In conducting that investigation, the officers could, without further justification, lawfully approach the hotel door and knock. *United States v. Lewis*, 476 F.3d 369, 381 (5th Cir. 2007); *see also Garcia-Cantu*, 253 S.W.3d at 243. Sergeant Calloway testified that he and two other officers went to the hotel room, and he knocked on the door. Testifying further, Calloway stated that after one of the occupants in the hotel room opened the door in response to the knock and the two people in the room recognized the officers as being the police, both retreated back into the room. One of the occupants said "I give up" while the other reached for a rifle that was on the bed. At the moment of entry, the officers were aware the occupants were armed and the occupants were aware that the persons at the door were police. The

20

exigency was created by either Dobbs or Colvin reaching for a rifle, not by Calloway knocking on the door. Because the officers' entry into the hotel room was constitutionally permissible, the trial court did not err in denying Colvin's motion to suppress evidence obtained by the immediate seizure of criminal instruments in plain view.

*The Automobile Exception*

The police may lawfully search an automobile without a warrant if they have probable cause to believe the vehicle contains evidence of a crime. *Neal v. State*, 256 S.W.3d 264, 282 (Tex. Crim. App. 2008) (citing *Wiede*, 214 S.W.3d at 24). The officers were investigating robberies and homicides in which the actors impersonated police officers. When Officer Heard collected the blood specimen from the truck, the officers had corroborated the informant's information that Colvin, Dobbs, and Conner were in room 237 with implements that could be used to impersonate a police officer. The officers also had reason to believe the men were felons in possession of a firearm. After seeing blood in the bed of the truck, the officer could reasonably conclude there was a fair probability of finding inculpatory evidence in the truck. *Neal*, 256 S.W.3d at 282; *Wiede*, 214 S.W.3d at 24.

*State Exclusionary Rule*

Article 38.23 of the Texas Code of Criminal Procedure, requires the exclusion only of evidence obtained "in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America[.]" Tex. Code Crim. Proc. Ann. art. 38.23 (West 2005). The trial court found the police did not illegally obtain the evidence at issue here. Viewing the facts in the light most favorable to the trial court's ruling, and affording deference to the necessary findings that support that ruling, we conclude the trial court did not abuse its discretion in denying Colvin's motion to suppress. We overrule issues three through five.

## EXTRANEOUS OFFENSE

In two issues, Colvin contends the trial court erred in admitting evidence from a police officer that as of September 5, 1984, Colvin was a convicted felon and by admitting into evidence a copy of the judgment for Colvin's 1980 conviction for delivery of methamphetamine. The trial court excluded a second 1977 robbery by assault conviction, which included a probation that was revoked for possession of marijuana and a pistol.

## Standard of Review

"Because trial courts are in the best position to decide questions of admissibility, we review a trial court's decision regarding the admissibility of evidence under an abuse of discretion standard." *Rodriguez v. State*, 203 S.W.3d 837, 841 (Tex. Crim. App. 2006). "This standard requires an appellate court to uphold a trial court's admissibility decision when that decision is within the zone of reasonable disagreement." *Id.*

## Status as Felon

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Tex. R. Evid. 404(b). Evidence of an extraneous offense may be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" *Id.* Colvin's 1980 conviction established that he was a felon when he was arrested. Here, the State offered the extraneous offense evidence as proof that Colvin was a felon in possession of a firearm on the date of his arrest. The State used the challenged evidence to justify the legality of Colvin's warrantless arrest and the search incident to the arrest. *See McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003) ("A search incident to arrest permits officers to search a defendant, or areas

23

within the defendant's immediate control, to prevent the concealment or destruction of evidence.").

*Unfair Prejudice*

Colvin argues the probative value of the extraneous offense evidence was substantially outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 403. The phrase "probative value" in Rule 403 "refers to the inherent probative force of an item of evidence--that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation--coupled with the proponent's need for that item of evidence." *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006). "Evidence might be unfairly prejudicial if, for example, it arouses the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence." *Id*. In conducting the balancing test required by Rule 403, the trial court considers factors including (1) how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable, (2) the potential the other offense has to impress the jury "in some irrational but nevertheless indelible way[,]" (3) the time the proponent will need to develop the evidence, and (4) the force of the proponent's need for this evidence to prove a fact of consequence. *Montgomery v. State*, 810 S.W.2d 372, 389-90 (Tex. Crim. App. 1991). "Evidence is unfairly prejudicial only when it

24

tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justifies its admission into evidence." *Casey v. State*, 215 S.W.3d 870, 883 (Tex. Crim. App. 2007).

Colvin argues that having the jury learn that he was a convicted felon during the guilt or innocence phase of the trial was unfairly prejudicial, but the fact that he was a previously convicted felon does nothing more than tend to prove the fact that justifies its admission in the first place. *See id.* The trial court's limiting instruction to the jury admonished that the evidence that Colvin was previously convicted of a felony

> was admitted only for the purpose of explaining, if it did, why the witness, William T. Callaway, could have detained the defendant for the offense of Unlawful Possession of A Firearm by a Felon. You cannot consider the evidence unless you find and believe beyond a reasonable doubt that . . . [Colvin], had previously been convicted of a felony.

The limiting instruction minimizes the potential for the extraneous offense to impress the jury in some irrational but indelible way. *Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996). The trial court was within the zone of reasonable disagreement when it concluded the probative value of the extraneous offense was not substantially outweighed by its prejudicial impact. We overrule issues six and seven.

25

CONFRONTATION

In two issues, Colvin contends his right of confrontation was violated when the trial court allowed an assistant medical examiner to offer her opinions regarding the cause of death for Buckels and McMahan, and when the trial court allowed a fingerprint examiner to testify about fingerprint comparisons based upon fingerprint impressions that were taken by a person who did not testify.

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. CONST. amend. VI. "The Sixth Amendment does not bar the admission of non-testimonial hearsay." *Sanchez v. State*, 354 S.W.3d 476, 485 (Tex. Crim. App. 2011) (citing *Michigan v. Bryant*, ___ U.S. ___, 131 S. Ct. 1143, 1153, 179 L. Ed. 2d 93 (2011)). But a testimonial hearsay statement may be admitted into evidence only if the witness is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68-69, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Generally, a hearsay statement is testimonial "when the surrounding circumstances objectively indicate that the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008).

26

The Confrontation Clause applies to analysts' reports that are created for use in a criminal proceeding. *Melendez-Diaz v. Massachusetts*, __ U.S. __, 129 S. Ct. 2527, 2532 174 L. Ed. 2d 314 (2009). Consequently, the Confrontation Clause prohibits the introduction of a testimonial forensic laboratory test report through the in-court testimony of a scientist who neither performed nor observed the test reported. *Bullcoming v. New Mexico*, __ U.S. __, 131 S. Ct. 2705, 2710, 180 L. Ed. 2d 610 (2011). In *Williams v. Illinois*, the Supreme Court stated:

> When an expert testifies for the prosecution in a criminal case, the defendant has the opportunity to cross-examine the expert about any statements that are offered for their truth. Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause.

*Williams v. Illinois*, __ U.S. __, 132 S. Ct. 2221, 2228, 183 L. Ed. 2d 89 (2012) (plurality op.). The admission of evidence in violation of the Confrontation Clause is constitutional error requiring reversal of the judgment of conviction unless the reviewing court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. Tex. R. App. P. 44.2(a).

*Autopsies*

Dr. Mary Anzalone, an assistant medical examiner with the Harris County Institution of Forensic Science, testified that she reviewed reports of two autopsies performed by Dr. Aurelio A. Espinola on September 29, 1984. She also reviewed

27

photographs that were admitted in evidence. Based upon her review of the reports and photographs, she formed an opinion that the individuals died as the result of gunshot wounds. She did not analyze the tracks of the bullets, she formed no opinion concerning the caliber of the bullets, and she could not determine the time of death.

The Dallas Court of Appeals addressed a Confrontation Clause challenge to a medical examiner's opinion testimony under similar facts in *Hernandez v. State*, No. 05-11-01300-CR, 2013 WL 1282260 (Tex. App.—Dallas Mar. 6, 2013, no pet. h.) (not designated for publication). In *Hernandez*, the medical examiner testified about the conclusion he reached after reviewing the autopsy report, the photographs, and the scene investigation history. 2013 WL 1282260, at *6. Based on that review, the medical examiner concluded that the victim died as the result of a gunshot wound to the back or trunk. *Id.* The Court held the witness provided an explanation of his independent conclusion in the case, not an after-the-fact explanation of the original medical examiner's opinion. *Id.* Where the jury does not hear the testimonial hearsay on which the expert's opinion was based, the medical examiner's testimony is not hearsay because the witness is available for cross-examination. *Hutcherson v. State*, 373 S.W.3d 179, 182-83 (Tex. App.—Amarillo 2012, pet. ref'd).

28

Dr. Anzalone provided her independent opinion without revealing the hearsay contained in Dr. Espinola's reports. The trial court did not err in admitting her testimony. Moreover, Detective Sergeant Troy Brown testified that he was present at the crime scene on September 28, 1984, and he attended the autopsies performed by Dr. Espinola. Based on his experience and his personal observation, the crime scene and the victims' bodies were consistent with two bodies being shot with a firearm. He watched Dr. Espinola recover three bullets from the two bodies. Cause of death was not a hotly contested issue in the case, and other evidence in the record establishes that the victims died from gunshot wounds. On this record, even if the trial court erred, we determine beyond a reasonable doubt that the alleged error did not contribute to the conviction or punishment. Tex. R. App. P. 44.2(a). We overrule issue eight.

*Fingerprints*

Mark Wild, a latent print examiner with the Texas Department of Public Safety Crime Lab, (DPS) testified that the laboratory uses a standardized laboratory submission form. Wild is a custodian for the laboratory's records maintained in the regular course of business. Wild stated that on February 24, 2011, he received a request to re-analyze and re-verify evidence that was previously submitted in 1984. The fingerprints were taken from two unknown

deceased individuals. The record assigned No. PA84-307 was a white male, contributed by the Harris County Medical Examiner. The record assigned No. 84-PA-306 and printed October 8, 1984, was a white female, submitted by the Harris County Medical Examiner. Wild compared the inked impressions of the unknown subjects to known fingerprints in the DPS's database. The known prints were from business records for McMahan and Buckels. Wild compared the unknown prints with the known prints and concluded that the unknown prints were identified to the known standards on file at the DPS for McMahan and Buckels. The trial court admitted Wild's written report on the fingerprint comparisons.

Colvin complains that the State failed to produce the crime laboratory employee, Wingo, to testify regarding how he removed and processed the victims' hands to secure their fingerprint impressions for identification. He argues the State admitted testimonial hearsay statements of Wingo through Wild's testimony regarding the fingerprint comparisons. Public records created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial are non-testimonial. *Bullcoming*, 131 S. Ct. at 2714 n.6 (quoting *Melendez-Diaz*, 557 U.S. at 324). Wild stated that he compared fingerprints that were submitted to the crime laboratory through records kept in the ordinary course of DPS's operations with known prints maintained in the DPS's

30

database. That statement, and Wild's testimony identifying the fingerprint impressions through the identifying numbers in those records, were not offered for the truth of the matter stated, but to identify the information that Wild compared and prepared his report about.

Wild did not testify regarding how the fingerprint impressions contained in the laboratory's files were obtained from the victims' hands. The statements on the records admitted into evidence through Wild involve neither "out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct" nor "formalized statements such as affidavits, depositions, prior testimony, or confessions." *Williams*, 132 S. Ct. at 2242. "[I]f a statement is not made for 'the primary purpose of creating an out-of-court substitute for trial testimony,' its admissibility 'is the concern of state and federal rules of evidence, not the Confrontation Clause.'" *Id.* at 2243 (quoting *Bryant*, 131 S. Ct. at 1155.). Any hearsay embedded within Wild's testimony and report of his first-hand analysis of the fingerprint impressions is non-testimonial. The actual fingerprint impressions were not statements. *See* Tex. R. Evid. 801(a). We overrule issue nine.

POLYGRAPH

In one issue, Colvin contends the trial court erred in failing to grant a motion for mistrial after Dobson, in a nonresponsive answer to a question asking if he recalled the name of the person he spoke with when he was taken from the Harris County Jail to Montgomery County after having contacted the Montgomery County Sheriff's Department through a cousin who worked as a sheriff's deputy, stated, "[Bill] is my cousin. Not the individual that was doing the lie detector test." The trial court sustained the objection that the answer was nonresponsive and instructed the jury to disregard the last statement made by the witness. The trial court denied Colvin's motion for a mistrial. Dobson then stated that he did not remember who took his statement.

The results of polygraph examinations are inadmissible because the tests are unreliable. *Leonard v. State*, 385 S.W.3d 570, 577 (Tex. Crim. App. 2012). In *Roper v. State*, the Court of Criminal Appeals held that the trial court's instruction to disregard was effective and no reversible error resulted from an officer's nonresponsive answer that "'[w]e carried him and run a polygraph test.'" 375 S.W.2d 454, 456-57 (Tex. Crim. App. 1964). Citing *Sparks v. State*, 820 S.W.2d 924 (Tex. App.—Austin 1991, no pet.), Colvin argues an instruction to disregard cannot cure the error in this case because Dobson's testimony was essential to

establish Colvin's actual participation in the murders and the polygraph reference bolstered Dobson's claim that Colvin had confided in him. In *Sparks*, the prosecutor asked the witness if he had taken a polygraph test. 820 S.W.2d at 926. The court concluded that the prosecutor's question was designed to elicit the answer given and "had no purpose but to elicit polygraph testimony." *Id*. at 927-28. Here, the State's question was not designed to elicit Dobson's response, and Dobson's nonresponsive answer did not reveal the results of the polygraph test. Under these circumstances, the trial court did not abuse its discretion by denying the motion for a mistrial. *See Roper*, 375 S.W.2d at 457. We overrule issue ten.

## HEARSAY

In two issues, Colvin complains that the trial court erred in admitting hearsay testimony into evidence. Sergeant Callaway testified that he investigated Colvin, Dobbs and Conner at the Crossroads Inn in response to information provided by a confidential informant. Callaway stated that the confidential informant told him that the persons of interest were armed. Colvin contends the statement was hearsay, not subject to any exception. He also claims the trial court commented on the weight of the evidence by citing a case by name in overruling Colvin's hearsay objection.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tex. R. Evid. 801(d). The Court of Criminal Appeals has recognized that testimony relating how the officer happened to be at the scene typically is not offered for the truth of the matter stated. *See Schaffer v. State*, 777 S.W.2d 111, 114-15 (Tex. Crim. App. 1989). "Almost always it will be relevant for a testifying officer to relate how she happened upon the scene of a crime or accident; thus, it is permissible for her to testify that she was acting in response to 'information received.'" *Id*. at 114.

*Schaffer* recognized the distinction between explaining the officer's presence and conduct, and relating historical aspects of the case. *Id.* at 114-15. In *Schaffer*, the defendant claimed he possessed peyote in a stolen van because he was working as an informer for an Abilene police officer named Seals. *Id.* at 112. In rebuttal, another officer, Segovia, testified that he had spoken with Seals that morning and that Segovia would not ask the State to drop the charges. *Id.* at 113. The trial court committed reversible error in admitting the testimony because the State introduced that testimony "for no other reason than to inferentially prove Seals told Segovia that appellant was not an informer." *Id*. at 115.

"[W]here there is an inescapable conclusion that a piece of evidence is being offered to prove statements made outside the courtroom, a party may not circumvent the hearsay prohibition through artful questioning designed to elicit hearsay indirectly." *Id.* at 114. Sergeant Callaway did more than state that he was acting on information received from an informant, but his statement that the confidential informant had told him the men were armed explained the aggressive behavior the officers exhibited at the scene. The trial court could reasonably have found that the evidence had a purpose other than the truth of the matter stated. *See id*.

Colvin argues the hearsay statement of the confidential informant that Colvin, Dobbs and Conner were armed was extremely damaging to him. If we consider the statement for the truth of the matter stated, the informant's hearsay statement that Colvin, Dobbs and Conner were armed was cumulative of the evidence that they had firearms with them in the hotel room. *See Gant v. State*, 153 S.W.3d 294, 300 (Tex. App.—Beaumont 2004, pet. ref'd) (stating where erroneous admission of evidence is cumulative of other properly admitted evidence proving the same fact, the erroneous admission is harmless). Thus, the admission of the statement would not affect Colvin's substantial rights. *See* Tex. R. App. P. 44.2(b).

Colvin also contends the trial court commented on the weight of the evidence when it ruled on the hearsay objection. The court said, "There is an exception for state of mind and also a statement offered to show probable cause or the reason for an investigation under *Sparks v State*, which is *935 S.W. 2nd, 462*." After counsel objected to a comment on the weight of the evidence, the trial court added, "Under the statement offered to show a reason for an investigation."

> Article 38.05 of the Code of Criminal Procedure provides:
>
> In ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether or not it is admissible; nor shall he, at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case.

Tex. Code Crim. Proc. Ann. art. 38.05 (West 1979). Colvin argues the trial court conveyed to the jury its opinion that his counsel was wrong and the State's argument was correct. The trial court's opinion regarding which party is correct on an objection is necessarily conveyed by the ruling itself. Here, the trial court's comment was directed towards the admissibility of the evidence, not its weight. *See Rosales v. State*, 932 S.W.2d 530, 538 (Tex. App.—Tyler 1995, pet. ref'd). We overrule issues eleven and twelve.

36

## IMPEACHMENT

In three issues, Colvin challenges the trial court's rulings regarding Colvin's impeachment of Dobson concerning Dobson's claim that the two of them were jailed together. Colvin complains the trial court erred by excluding Dobson's Houston Police Department records, that the trial court erred by allowing a detective to testify that his investigation confirmed Colvin and Dobbs were in jail together, and that the trial court erred in allowing Dobson's out-of-court hearsay statements as prior consistent statements.

In a written statement made on May 16, 1985, Dobson stated, "On July 27, 1984 I was arrested for misdemeanor theft and assault. I sat in the Harris County Jail til August 1, 1984 then bonded out. While on bond a blue warrant was issued for me, on which I was re-arrested August 28, 1984." During the trial, Dobson testified that he was arrested on a blue warrant for a parole violation sometime around August 1984 and while confined in the Harris County Jail he encountered Colvin, with whom he was already acquainted. According to Dobson, after Colvin made incriminating statements to him, he contacted a cousin who worked for the Montgomery County Sheriff's Department and explained what he had heard. Dobson claimed at trial that due to the passage of time, he could not recall how long it took for him to hear back from the Sheriff's Department, but eventually

they brought him to Montgomery County to make a statement. After being shown his statement, Dobson stated he gave his statement on May 16, 1985, while he was incarcerated.

On cross-examination, Dobson acknowledged the nine month gap between his claimed encounter with Colvin and making the statement. Dobson stated that in 1984 he was confined on a charge of shoplifting and assault originating from Harris County, not the Houston Police Department. He recalled telling the officers that he picked up the case at a hardware store off Highway 59. Dobson stated that he would not be surprised if there was no record of a conviction for an offense committed on July 27, 1984, but that he would be surprised if the Harris County Sheriff's Department stated it had no records of an arrest on July 27, 1984. When defense counsel asked,

> Would it also surprise you to know that under subpoena that I have certified documents from Harris County -- from the Houston Police Department that show they have absolutely no conviction for you or offense report for you, for any kind of theft from the hardware store where you picked up a misdemeanor theft or an assault?

Dobson replied, "I find that hard to believe, sir."

Colvin sought to introduce Dobson's Houston Police Department file for purposes of impeachment. The State objected that the records would be improper impeachment, that they were irrelevant, and that their admission would be unfairly

prejudicial. When the trial court asked how the records refuted that Dobson was in jail, defense counsel argued the proffered records refuted the reason Dobson was in jail. Defense counsel stated he was not disputing the existence of the blue warrant but that he intended to impeach Dobson concerning the date and the nature of the offenses for which he had been jailed. Noting that defense counsel had already been able to question Dobson regarding the discrepancy between his 1985 written statement and his trial testimony, the trial court sustained the State's objections to admitting the offense reports.

In questioning by defense counsel, Dobson acknowledged that he made an oral statement to Detective Duroy on January 6, 2010. After being shown what was described as an informal transcription of the videotaped statement, Dobson stated that the transcription included several mistakes, including that he stated he met Colvin in 1986. Dobson stated he met Colvin in 1976, when he sold Colvin a car. Defense counsel questioned Dobson about discrepancies between the story he told Detective Duroy in 2010 and his trial testimony. Dobson denied the 2010 statement was a fabrication, and stated that he "got [his] murders mixed up." Dobson admitted that Detective Duroy let him read the 1985 statement during the 2010 interview. Defense counsel asked whether the detective gave him the name and location of the hotel during the interview. Over Colvin's hearsay objection,

the trial court admitted Dobson's 1985 written statement as a prior consistent statement.

Over a hearsay objection, Detective Duroy testified that he investigated whether Colvin and Dobson were in jail together around October 1984, and he was able to confirm that they were, in fact, in jail together.

*Excluded Records*

The right to cross-examine "includes the right to cross-examine witnesses to attack their general credibility or to show their possible bias, self-interest, or motives in testifying." *Hammer v. State*, 296 S.W.3d 555, 561 (Tex. Crim. App. 2009). "The trial judge retains wide latitude to impose reasonable limits on cross-examination based upon concerns about, among other things, harassment, prejudice, confusion of issues, and the witness's safety." *Virts v. State*, 739 S.W.2d 25, 28 (Tex. Crim. App. 1987). Generally, issues relating to cross-examination may be resolved by reference to the Rules of Evidence. *Hammer*, 296 S.W.3d at 561. The trial court "may exclude any relevant evidence if its probative value is substantially outweighed by any or all of the countervailing factors specified in Rule 403." *Winegarner v. State*, 235 S.W.3d 787, 791 (Tex. Crim. App. 2007); *see also* Tex. R. Evid. 403. Rule 403 "gives the trial court considerable latitude to assess the courtroom dynamics, to judge the tone and tenor of the witness'

testimony and its impact upon the jury, and to conduct the necessary balancing." *Winegarner*, 235 S.W.3d at 791.

Colvin contends Dobson's Houston Police Department arrest records would have established that Dobson may have given false and misleading testimony when he told the jury that Colvin confided in him. The excluded exhibit records many arrests that occurred from 1970 through 1988. The exhibit includes a record of a May 10, 1985 arrest for shoplifting cigarettes, a doorlock, and a chainsaw from a Kmart, but it does not include a July 27, 1984 arrest for misdemeanor theft and assault. The absence of such a record suggests the Houston Police Department did not arrest Dobson on July 27, 1984, but it does not prove that no entity in Harris County arrested Dobson on that date. The Houston Police Department's records included some acts that had no relevance to Dobson's credibility, and others acts that resulted in convictions Dobson had already testified about. Colvin was able to explore the discrepancies in Dobson's various statements without resorting to the records. In balancing the prejudice arising from the records against their probative value, the trial court could have reasonably concluded that the probative value of the impeachment evidence offered by Colvin was substantially outweighed by the danger of unfair prejudice or confusion of the issues. *Winegarner*, 235 S.W.3d at 791. We overrule issue thirteen.

## Investigation

Colvin contends the trial court erred by allowing Detective Duroy to testify that his investigation confirmed that Colvin and Dobson were in jail at the same time. He argues Duroy's statement was "backdoor hearsay" that created "an inescapable conclusion that a piece of evidence is being offered to prove statements made outside the courtroom[.]" *Schaffer*, 777 S.W.2d at 113-14.

This case more closely resembles *Head v. State*, where an officer testified that in the course of his investigation of a child sexual abuse case he took statements from the outcry witness and the child's mother, and that their statements were consistent with the facts related to him by the child. 4 S.W.3d 258, 260 (Tex. Crim. App. 1999). The officer's statement did not reveal to the jury the substance of the information he obtained in his investigation. *Id.* "The trial court's ruling that the testimony did not fall within the scope of Rule 801(d) was 'within the zone of reasonable disagreement.'" *Id.* at 263 (quoting *Montgomery*, 810 S.W.2d at 391). We overrule issue fourteen.

## Prior Consistent Statements

Colvin challenges the trial court's ruling admitting Dobson's 1985 written statement as a prior consistent statement offered to rebut a claim of recent fabrication. "A statement is not hearsay if . . . [t]he declarant testifies at the trial or

hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive[.]" Tex. R. Evid. 801(e)(1)(B).

Colvin argues his cross-examination of Dobson did not charge recent fabrication or improper influence or motive. We view the evidence in the light most favorable to the trial court's ruling admitting Dobson's statement. *Klein v. State*, 273 S.W.3d 297, 304 (Tex. Crim. App. 2008). Rule 801(e)(1)(B) "sets forth a minimal foundation requirement of an implied or express charge of fabrication or improper motive." *Hammons v. State*, 239 S.W.3d 798, 804 (Tex. Crim. App. 2007) (discussing federal rule). "There is no bright line between a general challenge to memory or credibility and a suggestion of conscious fabrication, but the trial court should determine whether the cross-examiner's questions or the tenor of that questioning would reasonably imply an intent by the witness to fabricate." *Id.* at 805.

Defense counsel cross-examined Dobson about the details of the statement he made to Detective Duroy in 2010. Counsel asked Dobson if he recalled telling the officers that the victims had been killed in the apartment, then asked, "And that was total fabrication on your part, wasn't it?" When Dobson replied, "Got my

43

murders mixed up[,]" counsel asked Dobson, "Does that mean that you go around reading papers . . . of murder cases, and then you're snitching on people?" Counsel also asked Dobson if Detective Duroy let him read his 1985 statement during the 2010 interview. Defense counsel questioned Dobson about details in his 2010 statement, then asked, "And then you start remembering things once you see the statement, and he gives you all this information beforehand. You had absolutely no independent recollection of it until you saw that statement, right?"

At the time the State proffered Dobson's 1985 statement as a prior consistent statement, the trial court had before it sufficient information from which it could conclude that defense counsel's questioning of Dobson reasonably implied an intent by the witness to fabricate. *See id.* The trial court's ruling, being within the zone of reasonable disagreement, was not an abuse of discretion. We overrule issue fifteen.

RECORDED RECOLLECTION

In his final two issues, Colvin challenges the admission of an offense report purportedly written by a sheriff's deputy who lacked independent recollection of a 1984 offense report that bears his name. Colvin contends the offense report is inadmissible hearsay. *See* Tex. R. Evid. 801(d), 802. Colvin also contends the

44

trial court erred in admitting the physical evidence submission form that bears the officer's name and signature.

George Tones, a retired Montgomery County deputy with memory issues testified that he was a crime scene investigator in 1984 but he had no independent recollection of his work on this case. He could not recall preparing the offense report but acknowledged, "My name is typed on it." The State offered the offense report as a recorded recollection. *See* Tex. R. Evid. 803(5). Over Colvin's hearsay objection, the prosecutor read the contents of the offense report in front of the jury. The report described how Tones obtained fingerprints from the hands of the unknown male and female in the morgue and transported the fingerprints and the hands to the DPS laboratory in Austin. Tones stated that he believed he generated the submission form in the ordinary course of his duties as a crime scene investigator.

"A memorandum or record concerning a matter about which a witness once had personal knowledge but now has insufficient recollection to enable the witness to testify fully and accurately," is not excluded by the hearsay rule if it is "shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly, unless the circumstances of preparation cast doubt on the document's trustworthiness." Tex. R. Evid.

803(5). On appeal, the State concedes it failed to establish the predicate for the admission of a recorded recollection because Tones failed to vouch for the accuracy of the offense report. *See Johnson v. State*, 967 S.W.2d 410, 416 (Tex. Crim. App. 1998).

Although it concedes the trial court erred by allowing the offense report to be read into the record as a recorded recollection, the State argues the error did not affect a substantial right of the defendant. Tex. R. App. P. 44.2(b). The State used the offense report to authenticate the physical evidence submission form used to establish the chain of custody regarding the victims' hands and fingerprints. The State offered the physical evidence submission form as a public record over Colvin's objection that the document was an offense report. *See* Tex. R. Evid. 803(8).

Rule 803(8) does not necessarily make all law enforcement reports inadmissible. *See Cole v. State*, 839 S.W.2d 798, 807 n.5 (Tex. Crim. App. 1992) (op. on reh'g). Physical evidence requires sufficient authentication to support a finding that the exhibit in issue is what the proponent claims it to be. *See* Tex. R. Evid. 901(a). Where the State proves the beginning and end of the chain of custody, absent evidence of tampering, questions concerning care and custody of

46

the object go to the weight to be attached to the evidence and not to its admissibility. *See Lagrone v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997). Tones acknowledged the signed submission form appeared to have been generated by him and there is no evidence in the record to suggest otherwise. Detective Sergeant Troy Brown testified that he attended the autopsies performed by Dr. Espinola and observed the attempt to recover fingerprints. Wild, a DPS Crime Lab latent print examiner, compared the fingerprint impressions to the known fingerprints of Buckels and McMahan. McMahan's identity was also established through DNA analysis.

We hold the trial court had the discretion to determine the sufficiency of the evidentiary predicate for the physical evidence submission form. *See Llamas v. State*, 270 S.W.3d 274, 282 (Tex. App.—Amarillo 2008, no pet.). The offense report served only to buttress the chain of custody of items of physical evidence used to establish the identity of the victims. Colvin does not contend the evidence was tampered with, and the identity of one of the victims was corroborated by other evidence. We hold any error did not affect Colvin's substantial rights. *See* Tex. R. App. P. 44.2(b). We overrule issues sixteen and seventeen and affirm the judgment.

AFFIRMED.


_____
CHARLES KREGER
Justice

Submitted on November 26, 2012
Opinion Delivered June 12, 2013
Do Not Publish

Before McKeithen, C.J., Gaultney and Kreger, JJ.